Entered: September 28th, 2020



**THOMAS J. CATLIOTA**
**U.S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| In re: | * | Case No.   17-25757-TJC |
| Godfrey C. Douglas and | * | Chapter   11 |
| Sandra Kim Douglas | * | |
| Debtors | * | |
| * * * * * * * | * | |
| Godfrey C. Douglas and | * | |
| Sandra Kim Douglas | * | |
| Plaintiffs | * | |
| vs. | * | Adversary No.  18-00405 |
| GSJT, Inc., *et al.* | * | |
| Defendants | * | |
| * * * * * * * * * * * * * | | |

### <u>MEMORANDUM OF DECISION</u>

Debtors and plaintiffs Godfrey C. Douglas and Sandra Kim Douglas bring this adversary proceeding against defendants Dry Clean Concepts Inc. ("DCC"), Aaron Kawer (president of DCC), and The Bancorp Bank (the "Bank").  The complaint, as amended, seeks recovery of money, costs and other damages from contracts entered and loans taken out by Plaintiffs to start a dry-cleaning business that failed.  Now before the court are the defendants' motions to dismiss (ECF 25, 43, and 44), opposed by Plaintiffs.

1

In the Amended Complaint, ECF 18, Plaintiffs assert the following counts against Mr. Kawer and DCC:

- Count 1:  Unconscionability of contract and damages;
- Count 4:  Misrepresentation and Fraud;
- Count 5:  Avoidance of Fraudulent Transfers 11 U.S.C. §§548, 550, and 551;
- Count 6:  Avoidance of Fraudulent Transfers 11 U.S.C. §§544(a), (b), 550, and 551; and
- Count 8:  Turnover 11 U.S.C. §542.

In their motion, Mr. Kawer and DCC seek dismissal of Counts 1, 4, 5, and 8.

Plaintiffs assert the following counts against the Bank:

- Count 2:  Objection to the Bank's Claim
- Count 3:  Violation of the Equal Credit Opportunity Act
- Count 5:  Avoidance of Fraudulent Transfers 11 U.S.C. §§548, 550, and 551; and
- Count 7:  Avoidance of Fraudulent Transfers 11 U.S.C. §§544(a), (b), 550, and 551.

In its motion, the Bank seeks dismissal of all counts.

In their oppositions to the motions to dismiss, Plaintiffs request leave to amend their fraud claims against Mr. Kawer and DCC in Count 4, with facts from verified affidavits.  *See* ECF 50-1; ECF 57-1.  The court considers in this ruling the additional allegations in the affidavits.  Plaintiffs also request leave to add a count for violation of the automatic stay against the Bank.  ECF 66.

For the reasons stated here, the court will dismiss Counts 1, 4, 5, and 8 against DCC and Mr. Kawer, and will dismiss all counts against the Bank.  As described below, Plaintiffs' claim that the Bank violated the automatic stay lacks merit, and leave is denied to add that count.

## Jurisdiction

This court has jurisdiction over this matter pursuant to 28 U.S.C. §§1334(a), (b) and 157(b), and Local Rule 402 of the United States District Court for the District of Maryland.  The parties have consented to the entry of final orders by the Bankruptcy Court.

2

**Facts as alleged in the Amended Complaint**

As pertinent to the motions to dismiss, the facts alleged are as follows:

Plaintiffs filed for chapter 13 relief on November 27, 2017.  They filed a motion to convert the case to chapter 11, and the case was converted on November 19, 2018.  ECF 68 in Case No. 17-25757.

Prior to bankruptcy, Mr. Douglas sought to open a dry-cleaning business.  On the internet, he researched and found a consulting company, DCC, with a principal business location of 2516 Waukegan Road, Glenview, IL 60625.  Mr. Kawer is the owner and president of DCC, and he resides at 904 Judson Avenue, Highland Park, IL 60035.  Mr. Kawer served as the point of contact for all communications between DCC and Mr. Douglas.  DCC advertised itself as a full-service consulting firm for starting a dry-cleaning business.  This included providing clients advice from the onset of the business, assistance with equipment set-up, and information on financing and service models.  Mr. Kawer informed Mr. Douglas that he had 50 years of knowledge in the business.  Unlike Mr. Kawer, Mr. Douglas did not have any experience with formulating a business plan or owning a business.  ECF 18 at ¶15.

On January 27, 2015, both Plaintiffs personally signed a Deposit Agreement with DCC.  ECF 44-1; *see* ECF 18 at ¶20.  The pertinent terms included:

1. Client agrees to purchase from DRY CLEAN CONCEPTS, INC. dry cleaning / laundry equipment, installation, and services: to be identified on a purchase contract, and will be attached as an exhibit under the terms and at the prices set forth therein.
   *****
2. As a consultant fee, Client will pay DRY CLEAN CONCEPTS, INC. $5,000.00.
   This fee, less expenses that have been expended on behalf of the client, i.e. (travel to visit client and locations, lodging, automobile rental, acquisition of demographic information, business plan development and plant layout design)
   The balance of this fee will then be applied toward the purchase price listed in the Dry Clean Concepts contract.
   *****

3

4.   DRY CLEAN CONCEPTS, INC. will provide assistance to Client in the following respects:

    a.   DRY CLEAN CONCEPTS, INC. will identify to and inspect with Client potential lease (or land purchase) locations for the establishment and operation of his/her dry cleaning and laundry business.  DRY CLEAN CONCEPTS INC. will assist client in the selection of a location approved by him/her and in the negotiation of lease provisions. In this connection Client specifically understands and agrees that DRY CLEAN CONCEPTS, INC. makes no representations or warranties that either any of the locations which are exhibited or reviewed for him/her are well suited for the dry cleaning and laundry business or if established that such location will be successful.  Client further understands that the selection of a lease location is within his/her sole discretion.

ECF 44-1.  At some point in 2015, Mr. Douglas formed GSJT, Inc. ("GSJT"), also known as "Quick-N-Clean," for the purpose of operating the dry-cleaning business.

On June 3, 2015, Mr. Kawer provided a statement of "Services to Be Performed For Purchaser."  The pertinent terms included

- We will guide you through the entire process of developing your business.  This includes assistance in site selection and lease negotiations.
- We will help develop a business plan and projections for your business.
- We will design your entire plant, the customer waiting area, equipment placement, production and workflow.  The completed design package with all equipment and specifications are then submitted to a state registered architect for implementation and filed with the local municipality, for the approval of a dry-cleaning business.
- Install and start up all equipment purchased from Dry Clean Concepts, Inc., in accordance with your approval plans, and we will assist you in obtaining necessary permits.
- We visit your location to guide and advise in the hiring of potential employees.
- Prior to opening your own store we will train you at an existing Dry Clean Concepts dry-cleaning store for two weeks. Upon opening your store, a Dry Clean Concepts trainer will come aboard at your location for grand opening week for training with you and your staff, and will return in a month for an additional week of training, a total of four (4) weeks.
- We will guide you in the developing marketing & advertising for your demographic.
- After you have been open for a few months, we will visit your location to observe, and recommend operational adjustments that may be necessary.
- Consult and advise you by phone as long as you own your business.

4

- We supply an operation's manual to help you in day-to-day operations.

ECF 18-3 at 2 of 52.  The document was signed by Mr. Kawer, as president of DCC.  *Id.*

Both Plaintiffs personally signed a Purchase Contract with DCC on July 15, 2015.  *Id.* at 3-5 of 52.[1]  The purchasers were identified as Godfrey Douglas and Sandra Douglas.  The seller was DCC.  *Id.* at 5 of 52.  Invoice statements were sent from DCC to Godfrey Douglas and Sandra Douglas.  *Id.* at 7 of 52.  The total amount of the equipment purchase was $536,410.  Delivery, rigging & freight was $21,300.  The equipment installation fee was $64,420.  The grand total was $622,130.

Mr. Kawer found a realtor that Mr. Douglas used to lease the premises for the dry-cleaning business.  ECF 18 at ¶21.  He found an attorney to assist with the lease.  *Id.*  He found the loan broker, who referred Mr. Douglas to the Bank.  Mr. Kawer did not advise Mr. Douglas to hire an attorney for help with the loan process.  *Id.* at ¶22.

GSJT obtained a Small Business Administration loan through the Bank, guaranteed by Plaintiffs.  *Id.* at ¶¶4, 23.  Most, if not all of the communications between Mr. Douglas and the Bank, were through email.  *Id.* at 24 ("The entire substantive transactional relationship between Mr. Douglas and the Bank was by email, largely sponsored by Robin Paganafanador, an authorized agent of the Bank, in emails to and from Mr. Douglas.").  GSJT received a loan package on October 23, 2015.  *Id.*  In email exchanges, Mr. Douglas asked Ms. Paganafanador "*[d]o I call to go over it with you?*"  *Id.*  Ms. Paganafanador replied "*you don't have to.  The attorney is taking care of everything on the closing.  You just have to sign where the tabs are and get the few documents notarize[d] where it states.*"  *Id.*  She continued "*Everything you need to know will be in the package*."  *Id.*

---

[1] The Purchase Contract was dated on April 8, 2015, but signed by the parties on July 15, 2015.

Plaintiffs state that the Bank did not communicate or disclose the personal consequences of the loan or whether Mr. Douglas should have the loan documents reviewed by an attorney. *Id.* at 25. Based on Ms. Paganafanador's advise, Mr. Douglas signed the promissory note on behalf of GSJT for $613,200.00. *Id.* at 25 (misnumbered). Both Plaintiffs signed an "unconditional guaranty" dated October 21, 2015, and signed an Indemnity Deed of Trust ("IDOT") against their residence. *Id.* They were required by the Bank to sign the IDOT. *Id.*

Kawer and DCC created a 36-month projection, and GSJT could not meet those projections from the onset. *Id.* at ¶26. Plaintiffs state their total loss was $179,240.38 in 2016, and that the projections were objectively unrealistic. *Id.*

The Bank loan went into default on March 6, 2017, after three monthly payments were missed. According to a copy submitted by the Bank, Mr. Douglas filed Articles of Dissolution for GSJT on September 21, 2018, at 1:00 p.m. *See* ECF 25-2; ECF 50 at 18.

## Legal Standards

The defendants seek to dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(6), which applies in adversary proceedings pursuant to Fed. R. Bankr. P. 7012(b). "[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). When ruling on a motion to dismiss, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indust., Inc.*, 637 F.3d 435 (4th Cir. 2011).

To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to state a claim of relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.; *see also Twombly*, 550 U.S. at 547 (plaintiffs must nudge their claims "across the line from conceivable to plausible"). The Supreme Court has noted that the plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 681. When presented with a complaint, a court may look to "more likely explanations" to find that the allegations do not plausibly establish the claim. *Id*. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

Generally, " 'naked assertions' of wrongdoing" are insufficient to state a claim for relief. *Francis v. Giacomelli,* 558 F.3d 186, 193 (4th Cir. 2009) (citation omitted). The rule demands more than speculative facts to support a right to relief. *Twombly,* 550 U.S. at 555.

In general, under the Federal Rules, the consideration of materials outside the pleadings typically converts a motion to dismiss to a motion for summary judgment. Fed. R. Civ. P. 12(d). There is an exception. A court may consider extrinsic documents attached to a motion to dismiss, without converting it to a motion for summary judgment "so long as they are integral to the complaint and authentic." *Anand v. Ocwen*, 2014, 754 F.3d 195, 198 (4th Cir. 2014) (quoting *Philips v. Pitt Cty. Mem. Hosp*., 572 F.3d 176, 180 (4th Cir. 2009)); *see also Robinson*

*v. Am. Honda Motor Co.*, 551 F.3d 218, 222–23 (4th Cir. 2009). "When a document is properly considered in the context of a motion to dismiss and it conflicts with the bare allegations of the complaint, the document prevails." *Tinsley v. OneWest Bank, FSB*, 4 F. Supp. 3d 805, 819 (S.D.W. Va. 2014) (citing *Fare Deals Ltd. v. World Choice Travel.Com, Inc.*, 180 F.Supp.2d 678, 683 (D. Md. 2001); *see Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)).

Here, Count 4 asserts a claim for fraud, which Mr. Kawer and DCC move to dismiss for failure to plead fraud with particularity. Fed. R. Civ. P. 9(b), applicable here under Fed. R. Bankr. P. 7009, is a heightened pleading standard that seeks to provide a defendant with sufficient and fair notice of the plaintiff's claim in order to defend against the claim. The Fourth Circuit Court of Appeals has found that to satisfy Rule 9(b)'s pleading requirements, the complaint must identify with particularity "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). Moreover, where a case involves multiple defendants, Rule 9(b) requires that the complaint must allege all claims with particularity as to each defendant. *Dealers Supply Co., Inc. v. Cheil Industries, Inc.*, 348 F. Supp. 2d 579, 589-90 (M.D.N.C. 2004).

Rule 9(b) further provides that "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). This has been interpreted to allow a plaintiff to make "conclusory allegations of defendant's knowledge as to the true facts and of defendant's intent to deceive." *Dwoskin v. Bank of America*, 850 F.Supp.2d 557, 569 (D. Md. 2014). Generally, courts should hesitate to dismiss a complaint under Rule 9(b) "if the court is satisfied that (1) the defendant has been made aware of the particular circumstances for which

she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery

evidence of those facts." *Id.* at 569-70.

## Conclusions of Law

The court will first address the specific claims against Mr. Kawer and DCC, and then

address the specific claims against the Bank. Lastly, the court will turn to the avoidance and

turnover claims against the defendants.

### Count 1: Unconscionability of contract and damages against Mr. Kawer and DCC.

Plaintiffs contend that the July 15, 2015 purchase contract with DCC is unconscionable.

Maryland has adopted Uniform Commercial Code §2-302, which states:

> (1) If the court as a matter of law finds the contract or any clause of the contract to
> have been unconscionable at the time it was made the court may refuse to enforce
> the contract, or it may enforce the remainder of the contract without the
> unconscionable clause, or it may so limit the application of any unconscionable
> clause as to avoid any unconscionable result.
> (2) When it is claimed or appears to the court that the contract or any clause thereof
> may be unconscionable the parties shall be afforded a reasonable opportunity to
> present evidence as to its commercial setting, purpose and effect to aid the court in
> making the determination.

Md. Code Ann., Com. Law §2-302. To establish a contract is unconscionable, the moving party

must show that there is both procedural and substantive unconscionability. *Walther v. Sovereign

Bank,* 872 A.2d 735, 743-44 (Md. 2005). Procedural unconscionability is evidenced by "one

party's lack of meaningful choice." *Id.* at 743. It concerns the "process of making a contract"

and includes the use of "fine print and convoluted or unclear language" as well as "deficiencies

in the contract formation process, such as deception or a refusal to bargain over contract terms."

*Id.* Substantive unconscionability is evidence by "contractual terms that unreasonably favor the

other party." *Id.* The court must examine the contract with "special care" and examine "the

substance of the particular provision at issue . . . to decide whether it is unconscionable." *Id.* at 746-47.

Plaintiffs fail to state a claim for unconscionability because there is nothing left to perform on the contract and Plaintiffs do not owe a debt to DCC stemming from the contract. Plaintiffs filed a protective proof of claim in the main bankruptcy case on June 22, 2019, purporting to state that at least $1 was due and owing to DCC. Proof of Claim No. 11-1 in Case No. 17-25757. Mr. Kawer and DCC filed a motion to expunge the proof of claim. ECF 116 in Case No. 17-25757. No objections were filed, and the court expunged the claim. ECF 121 in Case No. 17-25757.

Relief for unconscionable contracts is a defensive measure, "it is to be used as a shield, not a sword, and may not be used as a basis for affirmative recovery." *In re BH Sutton Mezz LLC*, No. AP 16-01187 (SHL), 2016 WL 8352445, at *14 (Bankr. S.D.N.Y. Dec. 1, 2016) (quoting *Super Glue Corp. v. Avis Rent A Car Sys., Inc.*, 517 N.Y.S.2d 764 (App. Div. 2d Dep't 1987)). There are no other respective rights stemming from the contract between Plaintiffs and Mr. Kawer and DCC that the court must resolve. Thus, Plaintiffs' request to void the contract *ab initio* and order the return of all the monies paid must be dismissed for failure to state a claim.

Further, even if the foregoing were not the case, there are no allegations in the Amended Complaint that support a plausible claim that Plaintiffs lacked a meaningful choice but to enter the contracts with DCC and Mr. Kawer. Plaintiffs do not dispute it was they, and in particular, Mr. Douglas, who desired to enter the dry-cleaning business and who sought out DCC. Mr. Douglas investigated Mr. Kawer on the internet. The discussions over the transaction took place over 10 months. Both Mr. Douglas and Mrs. Douglas signed a deposit agreement with DCC and Mr. Kawer in January 2015. ECF 44-1 at 1-3. The agreement is a short, two-page agreement

with a third signature page.  It is not convoluted, complicated, or difficult to understand, and it contains no fine print.  *Id*.  Both Mr. Douglas and Mrs. Douglas signed the purchase contract six months later in July 2015.  The purchase contract is a straightforward list of equipment to be purchased, with one page of terms attached.  ECF 18-2 at 3-5.  Again, it is not convoluted, complicated, or difficult to understand, and it contains no fine print.  Mr. Kawer came to Maryland twice during that time to meet and discuss the transaction and Mr. Douglas went to Illinois to review some dry-cleaning operations hosted by Mr. Kawer.  The transaction did not close until October 2015.

Plaintiffs essentially contend that the agreements were procedurally unconscionable because they relied on Mr. Kawer's advice in opening the dry-cleaning business and he presented such a rosy view of the business's prospects:

> When I asked him questions about how he knew for sure this was going to work, he told me that he was the expert here, not me. He reminded me that he had 50 years in the dry cleaning business line and he knew what he was doing. This was a frequent refrain.

ECF 57-1 at ¶4.  The court addresses Plaintiffs' reliance contentions below in response to their fraud claims.  As pertinent here, viewing the allegations in a light most favorable to Plaintiffs, they, and particularly Mr. Douglas, considered purchasing dry-cleaning equipment and opening a store over a 10-month period and did so in reliance, according to Plaintiffs, exclusively on Mr. Kawer.  Plaintiffs' reliance on Mr. Kawer's advice in starting the business does not state a plausible claim of "no meaningful choice."  *Walther,* 872 A.2d at 744.  Count 1 fails for this reason.

Further, the court has serious misgivings about Plaintiffs' contention that the contract was "so one-sided as to oppress or unfairly surprise an innocent party or whether there exists an egregious imbalance in the obligations and rights imposed by the [contract]."  *Id*.  Plaintiffs

11

contend the business projection was wildly optimistic and were not achievable. But the

projection clearly states at the bottom of each page that "[t]hese projections are guidelines only

and are not guaranteed in total or in part by DRY CLEAN CONCEPTS, INC. or any of its

employees or agents." *See* ECF 18, Ex. 10.

Plaintiffs also contend that the location recommended by Mr. Kawer and DCC was bad.

Both Plaintiffs, however, expressly acknowledged that:

> Client specifically understands and agrees that DRY CLEAN CONCEPTS, INC. makes no representation or warranties that either any of the locations which are exhibited or reviewed for him/her are well suited for the dry-cleaning and laundry business or if established that such location will be successful. Client further understands that the selection of a lease location is within his/her sole discretion.

ECF 44-1 at ¶4. They also expressly acknowledged that:

> Client acknowledges that all businesses entail risk and acknowledge they have been sufficiently warned of the risks of starting a business and DRY CLEAN CONCEPTS, INC. makes no guarantees regarding the success of a specific location as predictions for the success of a given location is dependent on many factors.

*Id*. at ¶7. The Amended Complaint admits that the location was obtained for the store, the dry-

cleaning equipment was installed, the business operated, and the business failed. The Amended

Complaint establishes that Plaintiffs assumed the entrepreneurial risk of a new venture that,

sadly, failed. It does not state a plausible claim for unconscionability.

**Count 4: Misrepresentation and fraud against Mr. Kawer and DCC.**

Plaintiffs contend that Mr. Kawer made intentional misrepresentations of fact to them as

part of a scheme to procure money for worthless services provided by Mr. Kawer and DCC.

Plaintiffs state that they reasonably and justifiably relied upon these misrepresentations. They

further argue that the papers documenting the agreement between Plaintiffs and Mr. Kawer and

DCC show the fraudulent scheme perpetrated.

In Maryland, to assert a claim for fraud, the plaintiffs must allege that

(1) the Defendants asserted a false representation of a material fact to the Plaintiffs;
(2) that the Defendants knew that the representation was false, or the representation was made with such reckless disregard for the truth that knowledge of the falsity of the statement can be imputed to Defendants;
(3) that Defendants made the false representation for the purpose of defrauding the Plaintiffs;
(4) that Plaintiffs relied with justification upon the misrepresentation; and
(5) that Plaintiffs suffered damages as a direct result of the reliance upon the misrepresentation.

*Hoffman v. Stamper*, 867 A.2d 276, 292-94 (Md. 2005).

[A] cause of action for fraud has a strict requirement of scienter.  Recovery in a tort action for fraud or deceit in Maryland is based upon a defendant's deliberate intent to deceive.

To be actionable, a false representation must be of a material fact.  A material fact is one on which a reasonable person would rely  in making a decision, . . . or a fact that the maker of the misrepresentation knows . . . the recipient is likely to regard . . . as important.  And, the defendant must know[] that his representation is false or be recklessly indifferent in the sense that he lacks knowledge as to its truth or falsity.

*****

Notably, fraud cannot be predicated on statements that are merely expressions as to what will happen in the future.  The Fourth Circuit has said: It is true, as a general rule, that an action for fraud will lie only for misrepresentation of past or existing facts, and that breach of a promise to render a performance in the future is redressable only by an action in contract.

*****

As indicated, Maryland courts have recognized that a promise made to induce another to execute a contract, which the promisor never intended to perform, may create liability for fraud.  It follows that an action for fraud may not be dismissed on this basis if the alleged fraud is based on a defendant's promise that is made with the present intention not to perform that promise.  On the other hand, the failure to fulfill a promise is merely a breach of contract.

Thus, Maryland cases distinguish between statements that are a prediction or an expression of expectation concerning external events and those that are related to matters within the speaker's control.  Therefore, a predictive statement by a speaker who holds himself out as knowledgeable in a particular field can support a claim of fraud where the circumstances indicate that the speaker has a factual basis for his predictions of that the existence of facts is implied by the representations.

*Kiddie Academy Domestic Franchising, LLC v. Wonder World,* 2019 WL 1441812, *16-17 (D. Md. 2019) (cleaned up for quotations and citations).  "[A]s a general matter, a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract."  *Lankau v. Luxoft Holding, Inc.*, 266 F. Supp. 3d 666, 675 (S.D.N.Y. 2017) (quoting *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006)).

In *Kiddie Academy¸* a childcare franchise sued one of its franchisees for breach of contract among other claims.  The franchisee filed an amended counterclaim, which included a count for fraud against the franchise.  The franchisee alleged that the franchise made several misrepresentations with the purpose of inducing them to sign the franchise agreement and defraud them.  On a motion to dismiss the fraud counterclaim, the District Court discussed at length the factual statements that supported the allegation that there was a "business deal gone bad."

The Court noted that the amended counterclaim failed to provide any facts to support the assertion that the franchise company deliberately made statements with intent to deceive or for the purpose of defrauding the counterclaimant.  *Id.* at *18-19.  The facts included the following: (1) the business negotiation between the parties extended over years; (2) the franchise knew that the franchisee was an inexperienced owner and unsophisticated investor; (3) the franchisee was unfamiliar with the law; (4) representatives of the franchise stated they would help with the loan application and approval process; (5) representatives of the franchise stated they would help with the construction phase of the childcare site; and (6) a representative of the franchise helped with the creation of the business plan used to obtain the loan approval, and after construction began, a different franchise representative stated that the business plan was too aggressive.

14

The District Court determined that the amended counterclaim focused on repeated false assurances and predictions, which were just "puffing and related expressions of opinion that are common in sales [but] are not actionable as fraud." *Id.* at *19. Examples of these repeated representations included:

- The franchisee "had been told on repeated occasions that Kiddie and its employees were able to handle all aspects of setting up a franchise." *Id.* at *15. The franchise "bragged about is leadership in the industry and their qualifications for setting up successful franchises." *Id.*

- The Vice President represented that "his team would guide them through the entire construction process", when he knew that Kiddie "did not typically guide franchisees through the entire construction process." *Id.* at 18.

- Falsely assured them that "their lack of industry experience would not be an issue due to Kiddie's proven curriculum, marketing, and support[.]" *Id.*

- Falsely promised that "its employees would be present for the interviews of candidates for the franchise's Director." *Id.*

Here, Plaintiffs also focus on statements that amount as predictions and puffery. Mr. Douglas's affidavit submitted at ECF 57-1 states the following:

- Mr. Kawer promised me that he had been working in the area for 50 or so years and that he could guarantee that I would make money in a dry-cleaning store. He told me that I just had to follow what he would advise me to do. ¶3.

- He told me that I would be "instantaneously" successful there from the moment the store opened for two reasons. Firstly, how close it was to traffic flow and secondly because of the ethnic makeup of the neighborhood. Because I was a black owner in a minority

15

neighborhood, Mr. Kawer said that I would be able to make this work with very little

advertising dollars because that was a formula for dry-cleaning stores that worked well.

¶4.

- When I asked him questions about how he knew for sure this was going to work, he told

  me that he was the expert here, not me.  He reminded me that he had 50 years in the dry-

  cleaning business line and he knew what he was doing.  This was a frequent refrain.  *Id.*

- I checked Mr. Kawer on the internet and found nothing bad about him.  Mr. Kawer

  explained to me that he never failed and showed me the two or so dry-cleaning stores he

  knew and handled in the Chicago area.  From looking at this during my tour, I believed

  Mr. Kawer.  ¶5.

- The business failed because Mr. Kawer's advice was bad, and he misled me into

  spending thousands of dollars for a business model which would not have succeeded

  given his pro forma and advice.  ¶8.

The only "fact" alleged by Plaintiffs is that Mr. Kawer stated he had fifty years of

experience in the dry-cleaning business and he never failed.  Plaintiffs do not allege these

statements are untrue.  The other statements made by Mr. Kawer, like those in *Kiddie Academy,*

amount to predictions and opinion that are not actionable material facts.  The Amended

Complaint focuses on the "flawed" pro forma that was "objectively and subjectively

impracticable."  There is no question that the business did not meet the pro forma projections,

but there are no facts alleged that support a plausible claim that the pro forma was a document

deliberately made with intent to deceive or for the purpose of defrauding Plaintiffs.  In fact, as

stated above, Plaintiffs were made aware of the risks of the projections, in a writing at the bottom

of the pro forma: "[t]hese projections are guidelines only and are not guaranteed in total or in

part by DRY CLEAN CONCEPTS, INC. or any of its employees and agents."  ECF 57, Ex. 10.

Courts repeatedly refuse to convert "business deals gone bad" into fraud claims in the absence of

allegations of misrepresented material facts.  *See e.g. Bridgestone/Firestone, Inc. v. Recovery*

*Credit Servs., Inc.,* 98 F.3d 13, 20 (2d Cir. 1996) ("To maintain a claim of fraud in such a

situation [fraud claim based on breach of contractual duties], a plaintiff must either: (i)

demonstrate a legal duty separate from the duty to perform under the contract . . . or (ii)

demonstrate a fraudulent misrepresentation collateral or extraneous to the contract[.]");

*Advanced Tubular Prod., Inc. v. Solar Atmospheres, Inc*., No. CIV.A. 03-0946, 2004 WL

540019, at *7 (E.D. Pa. Mar. 12, 2004), aff'd, 149 F. App'x 81 (3d Cir. 2005) (quoting *Galdieri*

*v. Monsanto Co.,* 245 F.Supp.2d 636, 651 (E.D. Pa. 2002) ("A breach of contract claim,

however, "cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently

induced' or alleging the contracting parties never intended to perform.");  *Lissmann v. Hartford*

*Fire Ins. Co*., 848 F.2d 50, 53 (4th Cir. 1988) ("A Supreme Court of Virginia case . . . nicely sets

the distinction between a statement actionable as a breach of contract and a statement actionable

as a fraud. . . . Colonial Ford distinguishes between a statement that is false when made and a

promise that becomes false only when the promisor later fails to keep his word.  The former is

fraud, the latter is breach of contract.  A promise to perform an act in the future is not, in a legal

sense, a representation as that term is used in the fraud context.").  The claim for fraud fails to

pass muster under the plausible standards of Rule 12(b)(6) and pleading standards of Rule 9(b).

**Count 8: Turnover under 11 U.S.C. §542 against Mr. Kawer and DCC.**

Plaintiffs seek an order requiring Mr. Kawer and DCC to turn over $565,000 paid under

the contracts.  Section 542(a) requires a person in possession of property of the estate to deliver

the property or the value of the property to the trustee.  To prove a claim under §542(a), the

plaintiffs have the burden to prove that: "(1) the property is in the possession, custody or control of another entity; (2) the property can be used in accordance with the provisions of section 363; and (3) the property has more than inconsequential value to the debtor's estate." *In re DBSI, Inc.,* 468 B.R. 663, 669 (Bankr. D. Del. 2011) (internal quotation and citation omitted). "[C]ourts generally agree that the turnover provision 'is not intended as a remedy to determine disputed rights of parties [,][but] . . . to obtain what is acknowledged to be property of the estate.'" *In re Minh Vu Hoang,* 469 B.R. 606, 617 (D. Md. 2012) (quoting *In re Suncoast Towers South Assoc.,* Nos. 98–10537–BKC–AJC, 98–1451–BKC–AJA–A, 1999 WL 549678, at *10 (Bankr. S.D. Fla. June 17, 1999)).

The Amended Complaint does not, and cannot, plausibly allege that the money paid in 2017 by Plaintiffs to Mr. Kawer or DCC is property of the estate. Count 8 will be dismissed without prejudice until it is determined, if at all, that the Mr. Kawer or DCC hold property of the estate.

**Count 3: Violation of the Equal Credit Opportunity Act against the Bank.**

Plaintiffs contend the Bank violated the Equal Credit Opportunity Act (the "ECOA") by requiring Mrs. Douglas to sign a personal guaranty on the loan. Plaintiffs request the court to "strike" the guaranty and void the lien that supports the guaranty. In addition to attorney's fees, Plaintiffs also seek actual compensatory, consequential, statutory, and punitive damages under ECOA for $100,000.00. The Bank argues that under exceptions provided in the ECOA and corresponding regulations, it was permissible to request Mrs. Douglas to sign a personal guaranty.

The Fourth Circuit succinctly summarized the ECOA in *Ballard v. Bank of America, N.A.*, 734 F.3d 308, 310 (4th Cir. 2013):

The Equal Credit Opportunity Act makes it unlawful for "any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction on the basis of . . . marital status." 15 U.S.C. § 1691a(a)(1) (2006). Specifically, ECOA regulations prohibit lenders from requiring a spouse's signature on a loan agreement when the applicant individually qualifies for the requested credit. 12 C.F.R. § 202.7(d)(1) (2013) (lenders may not "require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness"). Congress enacted this prohibition to eradicate credit discrimination against married women, whom many creditors traditionally had refused to consider for individual credit.

Not every signature required of a borrower's spouse, however, constitutes credit discrimination under ECOA. Rather, the statutory scheme provides for several exceptions permitting lenders to obtain the signature of a borrower's spouse on a loan agreement.

One of the exceptions implicated here is "ECOA regulations expressly permit a lender to require a signature from a joint applicant spouse." *Id.* at 310. Both Mr. and Mrs. Douglas signed the agreements with DCC and Mr. Kawer, including the purchase agreement for the dry-cleaning equipment. ECF 44-1 at 1-3; ECF 18-2 at 3-5. More significantly, both Plaintiffs signed and submitted an "Affirmation of Intent to Borrow/ Guaranty" in June 2015, in which they stated "[w]e intend to apply for joint credit." ECF 65-2 at 1. Thus, the "joint applicant" exception would appear to apply.

Plaintiffs have submitted a jointly signed affidavit stating that the Bank directed them to have Mrs. Douglas be made an owner of GSJT. ECF 50-1 at ¶4. They allege that the Bank required her to own, along with Mr. Douglas, more than 20% of the shares of GSJT so it could require her to provide a guaranty. They contend this was an indirect way of allowing the Bank to obtain Mrs. Douglas's guaranty, even though she was not interested in being involved in the business of GSJT. The Amended Complaint, however, expressly states that the "entire substantive transactional relationship between Mr. Douglas and [the Bank] was by email, largely

sponsored by Robin Paganafanador, an authorized agent of [the Bank] in emails to and from Mr. Douglas." ECF 18 at 24.  Plaintiffs have submitted the emails to the court.  ECF 18-2 at 10-12. All are from October 2015 or later.  None address the joint statement made in June 2015 or an application submitted by Plaintiffs.

The ECOA exception that allows a bank to obtain the signature of a spouse who owns a certain percentage of a borrower is different from the exception that allows it to obtain the signature of a joint applicant.  Plaintiffs' repeated allegations that the Bank required Mrs. Douglas to become an owner of GSJT, in contrast to the complete absence of any allegations that the Bank required her to be a joint applicant, does not aid them in responding to the Bank's contention that Mrs. Douglas was a "joint applicant."

At the hearing on the motions, Plaintiffs' counsel asserted the Bank required Mrs. Douglas to be a joint applicant (as well as an owner) and that this was done by phone, not by email.  The court would likely grant Plaintiffs leave to file an amended complaint to include these allegations if the following, second exception did not apply.

As described in  the U.S. Small Business Administration Standard Operating Procedures, effective May 1, 2015:

> 5.  Employee Stock Ownership Plans (ESOPs) and 401(k) Accounts: When an ESOP or 40I(k) owns 20% or more of a Small Business Applicant, the Plan or Account cannot guarantee the loan.   The Plan or Account must meet all applicable IRS eligibility requirements.   In addition, the following loan conditions must be met:
>
> a)  The owner(s) of a 40l(k) must provide his or her full unconditional personal guaranty regardless of the individual ownership interest in the applicant concern.  This guaranty must be a secured guaranty if required by SBA's existing collateral policies.
>
> b) The members of the ESOP are not required to personally guarantee the debt, but all owners of the Small Business Applicant who hold an ownership interest of 20% or more outside the ESOP are subject to SBA's personal guaranty requirements.

c) The application cannot be structured as an EPC/OC. (13 CFR §120.111(a)(6)) (SBA regulations require each 20% or more owner of the EPC and each 20% or more owner of the OC to guarantee the loan, and the regulation does not provide for an exception.)

ECF 65-3 at 3. Here, the GSJT, Inc. Profit Sharing Plan (the "Plan") held a 66.67% interest in GSJT, the borrower. ECF 25-4 at 5. Both Mrs. Douglas and Mr. Douglas signed a Beneficiary Notification, acknowledging that they were beneficiaries of the Plan. ECF 65-1 at 1. Based on the face of these documents, it was appropriate for the Bank to obtain Mrs. Douglas's guaranty of the loan.

Plaintiffs allege that the Bank dictated the percentage ownership the Plan would hold in GSJT as a way of coercing Mrs. Douglas to provide a guaranty. This allegation fails to state a plausible claim for several reasons. First, the emails show that Mr. Douglas employed Benetrends, a third-party financial services firm, to assist him with creating the Plan. ECF 50-1 at ¶2. They show that Benetrends, not the Bank, created the Plan and structured its investment in GSJT. Second, the emails show that Mr. Douglas's IRA contributed more than $60,000 to the Plan, which in turn invested the funds in the equity of GSJT, receiving 66.67% of its shares. The emails show that Plaintiffs (or, giving effect to Plaintiffs' allegations, Mr. Douglas alone) invested approximately $30,000 in GSJT, receiving 33.33% of its shares (divided two-thirds to Mr. Douglas and one-third to Mrs. Douglas). The percentage ownership the Plan obtained in GSJT was a function of the amount the Plan invested, compared to the amount invested by Plaintiffs (or, giving effect to Plaintiffs' allegations, Mr. Douglas alone). It was not, nor could it be, an arbitrary percentage selected or directed by the Bank. Third, at most, the emails show that the Bank was interested in knowing how much was being contributed to its borrower and who was receiving the shares; they do not support the allegation that the Bank dictated the percentage the Plan must own in GSJT. Fourth, Plaintiffs allegation proves too much. The Plan needed to

acquire only 20% of GSJT's shares for the Bank to obtain Mrs. Douglas's guaranty under the regulations, but the Plan acquired 66.67% of GSJT. Plainly, the reason the Plan acquired 66.67% of GSJT was other than the Bank's alleged objective of obtaining Mrs. Douglas's guaranty.

For the foregoing reason, the court will dismiss Count 3 with prejudice.

**Count 2: Objection to the Bank's proof of claim.**

Plaintiffs' object to the allowance of the Bank's Proof of Claim No. 4-1 because it is based on Plaintiffs' guaranty, which purportedly violates ECOA. The court has dismissed the ECOA claim and therefore dismisses Count 2 to the extent it relies on the ECOA claim for relief.

In Count 2, Plaintiffs also seek to "strip" the Bank's secured claim under 11 U.S.C. §506. At the hearing on the motions, the parties recognized there is no dispute as to the applicability of §506(a) to the Bank's claim or the values of the Bank's secured and unsecured claims.[2]

The Bank's proof of claim expressly acknowledges the application of §506 and adopts Plaintiffs' own valuation of the collateral. Proof of Claim 4-1, Part 2, ¶¶11-13, in Case No. 17-25757. The Bank's total claim asserted in the proof of claim is $618,344.11. *Id*. at 2. The Bank holds a second lien on Plaintiffs' residence. Plaintiffs value the residence in the amount of $297,475 on their Schedule A/B, ECF 20 at 3 (Case No. 17-25757), and list the amount of the first deed of trust to be $159,815. ECF 20 at 18 in Case No. 17-25757. Therefore, the value of the Bank's interest in the collateral under §506(a) is $137,660 ($297,475 - $159, 815). This is

---

[2] Section 506(a) provides, in relevant part, that "an allowed claim of a creditor secured by a lien on property in which the estate has an interest is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property." Section 506(a) further provides, in relevant part, that an unsecured claim is a "claim to the extent that the value of such creditor's interest or the amount so subject to set off is less than the amount of such allowed claim."

the amount of the secured claim asserted by the Bank under §506(a). Proof of Claim 4-1, Part 2, ¶¶11-13 in Case No. 17-25757. The Bank also asserts an unsecured deficiency claim of $480,684.11 ($618,344.11 total claim less the $137,660 secured claim). *Id.* (showing calculation of Bank's secured and unsecured claims).

Because there is no dispute about the amount of the Bank's secured and unsecured claims, the Court will dismiss Count 2 without prejudice to the extent it seeks to strip the Bank's claim. As discussed at the hearing, the parties will include in Plaintiffs' chapter 11 plan the agreed upon values of the Bank's claims.

**Count 5: Avoidance of fraudulent transfers 11 U.S.C. §§548, 550, 551 against all defendants.**

Plaintiffs seek to avoid under 11 U.S.C. §548(a)(1) the transfer of monies from the Bank loan and the payments to DCC and Mr. Kawer for the equipment and other fees and charges. The defendants contend that Plaintiffs fail to state a claim under §548(a)(1) because the transfers Plaintiffs seek to avoid occurred outside of the two-year period provided in the statute. The defendants raise a host of other defenses, but the court agrees that Plaintiffs fail to state a claim under §548(a)(1).

Section 548(a)(1) provides relief for constructive fraudulent transfers. It provides, in pertinent part: "The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition . . . ." §548(a)(l). This court explained *In re Abell*, 549 B.R. 631 (Bankr. D. Md. 2016), that the two-year requirement of §548 is not a statute of limitations, but is rather an essential element of the claim. *See id.* at 657-658 (citing *In re Pitt Penn Holding Co., Inc.*, 2012 WL 204095, *2 (Bankr. D. Del. 2012) (declined to find that §548(a)(1) is a

statute of limitations and instead determined that the two-year bar is a substantive element)); *In re Maui Indus. Loan & Fin. Co.*, 454 B.R. 133 (Bankr. D. Haw. 2011) (determined that two-year bar is a fixed period and that the text did not permit discretionary extension); *In re Laurie*, 2008 WL 886121, *5 n. 3 (Bankr. D. Md. 2008) (noted that the lookback period was not a statute of limitations but that it was a substantive element); *In re Lyon*, 360 B.R. 749 (Bankr. E.D.N.C. 2007) (held that the one-year lookback was a substantive element and not a statute of limitations); *Crews v. Carwile (In re Davis)*, 138 B.R. 106 (Bankr. M.D. Fla. 1992) (held that the one-year time lookback period—now two years—is a restriction on the powers granted to the trustee and not a statute of limitations)).

The Bank loan closed on October 23, 2015, and the transfers to and from the Bank occurred at that time. The payments to DCC and Mr. Kawer for the equipment and other fees and charges also occurred at that time. The petition was filed on November 22, 2017. For a claim to proceed under §548(a), the alleged fraudulent transfer must have been made within two years before the petition date. Here, the transfers occurred prior to that time and cannot be the subject of a fraudulent transfer claim under §548(a)(1).

Plaintiffs argue that they can assert the §548(a)(1) claim under the doctrine of recoupment. Recoupment is a common law equitable doctrine which permits a party to assert a claim against a counter-party seeking recovery on a debt in order to reduce the amount of the claim. *Rusnack v. Cardinal Bank, N.A.,* 695 Fed. Appx. 704, 711 (4th Cir. 2017) (quoting *First Nat. Bank of Louisville v. Master Auto Service Corp.*, 693 F.2d 308, n.1 (4th Cir. 1982) (citation omitted)). Recoupment may not be invoked as an affirmative claim for relief. *Id.* Under certain circumstances, a claim can be asserted as a defense in recoupment even if the claim is time-barred provided the main action is timely. *Bull v. United States,* 295 U.S. 247, 262 (1935)).

24

Here, DCC and Kawer do not assert a claim against Plaintiffs.  Thus, there is no claim

that can be reduced under the doctrine of recoupment against them.  As to the Bank, recoupment

is not available.  Any transfers to the Bank occurred outside the period required by §548(a)(1).

As stated above, the two year look-back period in §548 is a substantive element of the claim and

is not a statute of limitations.  There simply is no §548 claim stated in the Amended Complaint

that Plaintiffs can assert, as recoupment or otherwise.  Count 5 will be dismissed.

**Count 7: Avoidance of fraudulent transfers under 11 U.S.C. §§544, 550, and 551 against the Bank.**

In Count 7, Plaintiffs seek to avoid the transfer from GSJT to the Bank as a constructive

fraudulent transfer, using the strong-arm provisions of §544.[3]  They contend the transfer is

avoidable under the Maryland Uniform Fraudulent Transfer Act.[4]  They recognize that GSJT is

dissolved, but contend that as directors of a dissolved corporation they can assert GSJT's claim

against the Bank in this proceeding.  The court disagrees.  Although Maryland law allows

---

[3]  Since there is no question that the Bank actually advanced $613,200 to GSJT, it is not clear how GSJT did not obtain reasonably equivalent value for executing the note and providing the collateral to the Bank.  ECF 18 at ¶25. The court, however, need not address the merits of the claim for the reasons stated.

[4]  Plaintiffs assert claims under the following provisions:

Md. Code Ann., Com. Law §15-204: "Every conveyance made and every obligation incurred by a person who is or will be rendered insolvent by it is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration";

Com. Law §15-205: "Every conveyance made without fair consideration when the person who makes it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and other persons who become creditors during the continuance of the business or transaction without regard to his actual intent";

Com. Law §15-206: "Every conveyance made and every obligation incurred without fair consideration when the person who makes the conveyance or who enters into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.";

Com. Law §15-207: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors is fraudulent as to both present and future creditors."

Plaintiffs to bring GSJT's claim as part of the winding up process of a dissolved corporation, they do so as trustees and directors. Therefore, GSJT's assets, including its claim against the Bank, are not property of the estate. Section 544 gives the debtor in possession the rights and powers of a hypothetical lien creditor or a bona fide purchaser "to avoid any transfer of *property of the debtor* or any *obligation incurred by the debtor*" under nonbankruptcy law. §544(a) (emphasis added). Because Plaintiffs do not seek to avoid a "transfer of property of the debtor" or "any obligation incurred by the debtor," Count 7 will be dismissed.

GSJT was dissolved by filing the Articles of Dissolution on September 21, 2018. ECF 25-2; ECF 50 at 18. Thus, on the petition date, November 22, 2017, GSJT was a corporation registered to conduct business.[5]

A corporation is a legally recognized entity. *See* Md. Code Ann., Corps. & Ass'ns §§1-101, *et seq*. The Maryland Code provides for the dissolution of a corporation in Corps. & Ass'ns §§3-401, *et seq*. If the board of directors or shareholders decide to voluntarily dissolve, then the corporation may dissolve by delivering articles of dissolution. *See id.* §§3-406 and 3-407. A corporation is dissolved on the date when the Department accepts the articles of dissolution. *Id.* at §3-408(a).

Dissolution, however, does not terminate the corporate existence. *Id.* at §3-408(b). A dissolved corporation continues its existence "for the purpose of paying, satisfying, and discharging any existing debts or obligations, collecting and distributing its assets, and doing all other acts required to liquidate and wind up its business and affairs." *Id.* "When a Maryland corporation is voluntarily dissolved, until a court appoints a receiver, the business and affairs of

---

[5] Curiously, Plaintiffs state the Articles of Dissolution were filed on September 21, ***2017***, not 2018. ECF 50 at 18. They cite to the copy of the Articles in the record, which plainly state they filed on September 21, 2018 at 1:00 p.m. ECF 25-2. The court would reach the same result whichever date the Articles were filed.

the corporation shall be managed under the direction of the board of directors for the purposes

set forth in §3-408(b)."  *Id.* at §3-410.

> On behalf of the corporation, the directors shall: (1) Collect and distribute the assets, applying them to the payment, satisfaction, and discharge of existing debts and obligations of the corporation, including necessary expenses of liquidation; and (2) Distribute the remaining assets among the shareholders.

*Id.* at §3-410(b)(1)-(2).  The directors may "[s]ue or be sued in the name of the corporation."  *Id.*

at §3-410(c)(1).  Thus, dissolution does not automatically transfer assets and claims to the

shareholders of the corporation.  *See generally id.* at §3-410.  The assets of the dissolved

corporation must be used to satisfy the claims of creditors.  *Id.* at §3-410(b).  If there is value in

such assets after all claims are satisfied, the remaining property may be distributed to

shareholders.  *Id.* at §3-410(b)(2).

The law is practically identical when a corporation forfeits its existence.  *See id.* §3-410

(effective June 1, 2004); §3-515 (effective October 1, 2017).

Maryland law "makes it clear that a corporation continues to exist, at least for some

limited purposes beyond forfeiture or dissolution of its charter."  *Thomas v. Rowhouses, Inc.*, 47

A. 3d 625, 630 (Md. App. 2012).

> According to CA § 3–515, "[w]hen the charter of a Maryland corporation has been forfeited, until a court appoints a receiver, the directors of the corporation become the trustees of its assets for purposes of liquidation." This "corporate survivor" statute allows the director-trustees to sue or be sued "in the name of the corporation." The Court of Appeals has interpreted CA § 3–515 to grant directors-trustees power "only for the 'winding up' of a corporation's affairs." As a consequence, "a trustee only may sue in the trustee's own name if there is a 'rational relationship' between the suit and a legitimate 'winding up' activity of the corporation." *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 163–164, 857 A.2d 1095 (2004) (internal citations omitted). However, "winding up" also generally includes paying all debts, obligations and liabilities of the corporation, distributing property and resolving pending suits against the corporation. . . . Thus, under CA § 3–515, a corporation, whose charter has been forfeited and which is in the process of "winding up," is still "alive" for purposes of being sued to satisfy its debts and liabilities.

*Thomas,* 47 A.3d at 629-30 (citations and quotations omitted).

Here, Plaintiffs do not dispute the foregoing.  They contend they may bring GSJT's fraudulent transfer claim against the Bank as directors or trustees of GSJT and as part of the winding up process.  They then engage in *ipsi dixit* by simply stating GSJT's claim against the Bank "is an asset of Mr. Douglas as President and shareholder of GSJT."  ECF 50 at 18.  On this point, Plaintiffs overstep.

Filing a petition for bankruptcy creates an estate.  Section 541(a) provides a broad definition of property of the estate to include all legal or equitable interests of the debtor as of the commencement of the case.  11 U.S.C. §541; *In re Dameron*, 155 F.3d. 718 (4th Cir. 1998).  The Bankruptcy Code, however, expressly excludes from the estate any "property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest." §541(d).  The debtor-in-possession or trustee can take no greater rights in property than the debtor itself holds.  *Dameron*, 155 F.3d at 721-722.  Therefore, when a debtor does not hold the equitable interest in property it holds for another, that interest is not property of the estate for purposes of the Bankruptcy Code.  *Id.*

The question of what constitutes an equitable interest subject to exclusion from the bankruptcy estate under §541(d) must be resolved by state law.  *Butner v. United States,* 440 U.S. 48, 55 (1979); *Dameron*, 153 F.3d at 722.  As established above, the directors of a dissolved corporation become trustees of the corporation's assets.  The equitable interest in those assets remains with the corporation.  GSJT exists "for the purpose of paying, satisfying, and discharging any existing debts or obligations, collecting and distributing its assets, and doing all other acts required to liquidate and wind up its business and affairs."  Corps. & Ass'ns §3-

28

408(b).[6]  Therefore, Plaintiffs do not hold an equitable interest in GSJT's assets, including its

claim against the Bank.  Section 544(a) cannot apply and Count 7 will be dismissed.

**Leave to amend to add a claim of violation of the automatic stay against the Bank.**

In their response to the Bank's motion to dismiss, Plaintiffs request "as trustees and

directors for GSJT . . . leave to amend the Amended Complaint to present a count for violation of

the automatic stay, both for the willful entry of the confessed judgment after the Petition Date as

to [Plaintiffs and GSJT]; but also for failure to strike the void judgment against GSJT."  ECF 50

at 25.  Leave will not be granted because Plaintiffs fail to state a claim for violation of the

automatic stay.  *See Just Puppies, Inc. v. Frosh*, --- F. Supp. 3d ---, No. CV ELH-19-2439, 2020

WL 3259084, at *7 (D. Md. May 6, 2020) (quoting *Save Our Sound OBX, Inc. v. N.C. Dep't of

Transp.*, 914 F.3d 213,228 (4th Cir. 2019) (a court should deny a motion to amend when the

proposed amendment would be futile—when the claim would not survive a motion to dismiss).

There is no dispute that the Bank filed for the confessed judgment against Plaintiffs and

GSJT on October 31, 2017, prior to the petition date of November 22, 2017.  *The Bancorp Bank

v. GSJT, Inc. et al*, CAL 17-31740 (Circuit Court for Prince George's County).[7]  The docket

sheet shows that the Bank took no action in the proceeding after the petition date, and the

Amended Complaint or Plaintiffs' response does not allege otherwise.  ECF 25-3 at 38-40.  The

Circuit Court entered an Order Directing Confessed Judgment on December 18, 2017, against

GSJT and Plaintiffs.  Because the Circuit Court entered the order after the petition date, the Bank

---

[6] The court takes judicial notice that Plaintiffs' schedules filed in the bankruptcy case show that substantial debts of
GSJT are unsatisfied.  In their Schedule G, Plaintiffs listed Penn Station Improvements, LLC as the lessor for GSJT.
ECF 20 at 28 in Case No. 17-25757.  On Schedule H, GSJT was listed as a codebtor for a variety of debts on
Schedule E, F, and G.  *Id.* at ECF 79.

[7] The Bank submitted the docket sheet for the confessed judgment action.  ECF 25-3 at 38-40.  Plaintiffs do not
dispute its accuracy.

filed a motion to vacate the confessed judgment against Plaintiffs. *Id*. The Bank did not seek to vacate the judgment against GSJT.

Plaintiffs, stating they filed Articles of Dissolution for GSJT on September 21, 2017, rather than 2018, *see supra* n. 5, contend that the assets of GSJT were their personal assets as of the petition date. They contend the Bank violated the stay by obtaining the confessed judgment against GSJT after the petition date and not seeking to release the judgment. The claim is futile. The only document in the record shows that GSJT was not dissolved until long after the Circuit Court entered the confessed judgment. *See supra* n. 5. Thus, GSJT was a separate corporate entity as of the petition date. But even if the Articles were filed on September 21, 2017, as Plaintiffs state, for the reasons stated above, after dissolution the assets of GSJT were not property of Plaintiffs' estate to which the automatic stay applied. Plaintiffs were only trustees or directors of GSJT. 11 U.S.C. §541(d). Plaintiffs can state no claim that the Bank violated the automatic stay with respect to GSJT.

Further, Plaintiffs identify no action the Bank took post-petition that violated the stay as to them personally. Although the Circuit Court entered the confessed judgment after the petition date, that was done based on the Bank's complaint that was filed prepetition. The docket sheet shows the Bank took no action in the confessed judgment case after the petition date other than to file a motion to vacate the judgment. The request for leave to amend the complaint is denied.

### Conclusion

For the foregoing reasons,

- o  Counts 1, 4 and 5 are dismissed against defendants Dry Clean Concepts Inc. and Aaron Kawer, with prejudice; and

o   Count 8 is dismissed against defendants Dry Clean Concepts Inc. and Aaron Kawer, without prejudice; and

o   Counts 3, 5 and 7 are dismissed against the Bank with prejudice; and

o   Count 2 is dismissed against the Bank with prejudice to the extent it is based on the Bank's alleged violation of ECOA and is dismissed without prejudice to the extent it is based on the bifurcation of the Bank's claim pursuant 11 U.S.C. §506(a); and

o   Plaintiffs' request for leave to amend the complaint to add a claim that the Bank violated the automatic stay is denied; and

o   Plaintiffs' request for leave to amend the complaint to supplement Count 4 with the allegations contained in their affidavits is denied.

A separate order will be issued.

cc:    all parties
       all counsel

**END OF MEMORANDUM OF DECISION**